The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Commissioner Ballance, the briefs on appeal and arguments of counsel. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives or amend the Opinion and Award. Accordingly, the Opinion and Award by Commissioner Bernadine S. Ballance is affirmed.
This case was originally heard before Commissioner Ballance in Rockingham on 12 January 1994 when she was a Deputy Commissioner. After the hearing the record remained open for submission of medical evidence by deposition testimony and/or stipulated medical records. The deposition testimony of Dr. Ward S. Oakley, Jr., was taken after the hearing. After the record was closed, it was reopened by Commissioner Ballance to clarify a medical issue. A second deposition was taken of Dr. Ward S. Oakley on 14 March 1995.
* * * * * * * *
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. At all times relevant hereto, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all times relevant hereto an employer-employee relationship existed between plaintiff and defendant-employer.
3. Defendant-employer is self-insured and the servicing agency is Constitution State Services.
****************
The Full Commission adopts the Findings of Fact found by the Deputy Commissioner, as follows:
FINDINGS OF FACT
1. At the time of hearing plaintiff was 40 years old and was a high school graduate. Plaintiff had worked for defendant-employer from 24 July 1972 until 19 October 1993, a period of more than 21 years.
2. Over her twenty-one (21) year work history with defendant-employer, plaintiff worked primarily in the packaging department. This job involved reaching over to the right, picking up panty hose, folding the panty hose several times, putting the panty hose in a container called an egg, putting the egg in a cylinder, closing and sealing the egg by pressing the cylinder onto the egg with the hands, and putting the egg in a tray. Each tray held 30 eggs and there were four trays per case. For a long period of time, plaintiff had to hammer the cases to seal them but this procedure was later changed. In order to make production plaintiff had to complete from 22 to 23 cases per hour. Such job duties required constant, rapid and repetitive motion of the wrist, arms and hands.
3. In August of 1992 plaintiff was moved to a new job called AGT operator where she was sewing panty hose. This also was a production job that required rapid, repetitive motion with the hand, arms and wrists. Plaintiff's job involved reaching with her left hand to pick up a panty hose and fitting the panty hose on a machine for the seams to be sewn. The machine would sew the panty hose and automatically transfer the sewn panty hose to the next machine. Plaintiff's machine malfunctioned about 100 times per day and during those times she had to manually transfer the panty hose to the next machine. The manual transfer work involved reaching her hand into a very small space in the back of the machine, placing her hand behind a bar and pushing the bar to reload the machine. Maneuvering her hand in such a tight space to reload the machine after a mistransfer would cause plaintiff's hand to hurt. In order to make production plaintiff had to handle approximately 1,800 panty hose per day.
4. During the Fall of 1992 plaintiff began to feel sharp pain in her left arm, tingling in her fingers and swelling in her right hand. Plaintiff reported her symptoms immediately to her supervisor and was sent to the plant nurse. On 3 November 1992 plaintiff was sent by defendant-employer to Dr. Ward S. Oakley, Jr., who diagnosed probable tendinitis or overuse syndrome related to repetitive type work.
5. At that time plaintiff complained of pain in her left hand and wrist for about a month and numbness associated with the pain. Plaintiff related that her problems came shortly after a job change. Dr. Oakley pursued conservative treatment and placed plaintiff in a wrist brace.
6. Plaintiff returned to Dr. Oakley on 24 November 1992 complaining that she was now having pain and tingling sensations along her fingers of her right hand. Dr. Oakley placed plaintiff's right hand in a wrist splint and directed that she should avoid repetitive, strenuous use of the hand. The wrist splints on both hands was a form of treatment to reduce the inflammation, particularly that inflammation which is associated with repetitive bending and grasping maneuvers. Dr. Oakley again diagnosed tendinitis, this time to the right hand and arranged for plaintiff to undergo neurological testing. The nerve tests were normal, but according to Dr. Oakley that did not rule out carpal tunnel syndrome in that there is about a five (5) percent chance that one can have carpal tunnel syndrome and have a normal NCV or normal nerve tests.
7. Dr. Oakley restricted plaintiff to work that did not involve repetitive use of the hands and wrists because that is the motion usually associated with either tendinitis, or overuse syndrome, and carpal tunnel syndrome. He rendered an opinion that at the time he released plaintiff from treatment in November 1993, she was suffering from chronic tendinitis, or overuse syndrome of both hands caused by plaintiff's repetitive work activities with defendant-employer.
8. Dr. Oakley's final recommendation was that plaintiff should seek a permanent job change and that she should not do any work involving repetitive, stressful use of her hands. He assigned plaintiff a twenty-five (25) percent permanent partial impairment rating to each hand on 19 October 1993.
9. The cause of plaintiff's tendinitis or overuse syndrome is not controverted and defendants have not produced evidence to contradict the permanent-partial disability rating of Dr. Oakley.
10. The Full Commission finds from the evidence that plaintiff worked on a production driven job; that her job required rapid, repetitive bending, grasping and flexing of both hands and wrists; that plaintiff's job activities caused stressful overuse and trauma to both hands; and that the motions and maneuvers required of plaintiff's hands in a very small space during times when the AGT machine did not transfer properly (up to 100 times per day) were particularly traumatic to her hands.
11. Dr. Oakley rendered an opinion that tendinitis is synonymous to and used interchangeably with tenosynovitis in the medical profession and said that he had used tendinitis as a synonym for tenosynovitis in reference to plaintiff's condition. Tenosynovitis caused by trauma in the employment is a scheduled occupational disease.
12. Plaintiff's constant use of her hands in strained positions to reload the machine after it mistransferred and her rapid and repetitive use and overuse of her hands in her production driven job caused cumulative and repetitive trauma to both hands resulting in tenosynovitis caused by such trauma. Plaintiff's medical history revealed no other factors or conditions that would predispose her to contracting tenosynovitis outside her work activities.
13. Plaintiff's employment caused her tenosynovitis, an occupational disease. Plaintiff's employment exposed her to a greater risk of developing this occupational disease than the public in general.
14. Plaintiff's earnings dropped from an average of $7.57 per hour to approximately $6.60 per hour beginning 3 November 1992 through 30 September 1993 as a result of her occupational disease. Plaintiff's diminished earning capacity constituted a disability as defined in N.C. Gen. Stat. § 97-2 (9).
15. Plaintiff's job ended with Sara Lee in September 1993. She was given an option to transfer to a new plant, but chose not to transfer because she was still under the care of a doctor for the problems with her hands and she did not believe she was able to do the production-type of work available. At that time, plaintiff was earning $6.60 per hour and retained the capability of earning $6.60 per hour.
16. Plaintiff's average weekly wage at the time of disability due to her occupational disease was $311.64, yielding a compensation rate of $207.77 per week.
***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows
CONCLUSIONS OF LAW
1. As a result of the cumulative trauma or overuse to both hands caused by her production-driven, highly repetitive job, as fully described in the Findings of Fact herein, plaintiff contracted tenosynovitis caused by such trauma. Tenosynovitis caused by trauma is a scheduled occupational disease. Plaintiff's occupational disease was originally diagnosed as tendinitis or overuse syndrome which is not a scheduled occupational disease; however, tendinitis was used as a synonym for tenosynovitis by Dr. Oakley in reference to plaintiff's condition. Plaintiff's employment significantly contributed to or was a significant causal factor in the development of her occupational disease. Plaintiff's work exposure placed her at a greater risk of developing chronic tenosynovitis than the public in general.
2. Tenosynovitis caused by trauma in employment is a scheduled occupational disease. N.C. Gen. Stat. § 97-53 (21). The modifying phrase, "caused by trauma in employment" refers to a series of events in employment occurring regularly or at frequent intervals over an extended period of time and culminating in the condition known as tenosynovitis. Henry v. Leather Co.,234 NC 126 (1951). Plaintiff's tenosynovitis was caused by trauma to her hands which she sustained as a result of her employment. Plaintiff has contracted a compensable occupational disease within the meaning of N.C. Gen. Stat. § 97-53 (21) and § 97-53 (13).
3. As a result of her occupational disease, plaintiff sustained diminished earning capacity from 3 November, 1992 through 30 September, 1993 and would be entitled to temporary partial disability compensation in an amount representing two-thirds of the difference in her average weekly wage before and after disability from her occupational disease. Subtracting plaintiff's weekly earnings after 3 November 1992 from her average weekly wage of $311.64 per week and multiplying times two-thirds would yield a temporary partial disability rate of $31.78 per week.
4. As a result of her compensable occupational disease, plaintiff sustained a twenty-five percent (25%) permanent partial impairment to both her right and left hand and is entitled to permanent partial disability compensation for such impairments. N.C. Gen. Stat. § 97-31.
5. Plaintiff is entitled to have the defendant provide all medical treatment arising from her compensable occupational disease. N.C. Gen. Stat. § 97-25.
6. Plaintiff's refusal to transfer to a new plant when her job ended on 30 September, 1993 constitutes a refusal to accept suitable employment. At that time, plaintiff had the capacity to earn $6.60 per hour. N.C. Gen. Stat. § 97-32.
7. Although plaintiff has not made an election, it is more beneficial for plaintiff to accept compensation under N.C. Gen. Stat. § 97-31.
*****************
Based on the foregoing findings of fact and conclusions of law the Full Commission affirms the holding of Commissioner Ballance and enters the following:
AWARD
1. Subject to an attorney's fee awarded herein; defendant shall pay to plaintiff in one lump sum, without commutation, permanent partial disability compensation at the rate of $207.77 per week for 50 weeks for the twenty-five percent (25%) permanent partial disability to her right hand and additionally, permanent partial disability compensation at the rate of $207.77 per week for 50 weeks for the twenty-five percent (25%) permanent partial disability to her left hand.
2. Defendants shall pay to plaintiff temporary partial disability compensation at the rate of $31.78 per week from 3 November 1992 through 30 September 1993, subject to the attorney's fee hereafter discussed.
3. A reasonable attorney fee in the amount of twenty-five percent (25%) of the compensation awarded to plaintiff herein is hereby approved for plaintiff's counsel. Such fee shall be deducted from this award and forwarded directly to plaintiff's attorney.
4. Defendants shall pay all reasonable and necessary medical expenses incurred or to be incurred by plaintiff as a result of her compensable occupational disease when bills for same are submitted to Defendant Employer and approved pursuant to procedures established by the Commission, for so long as such medical treatments are reasonably required to give relief, effect a cure or lessen plaintiff's disability.
5. Defendant shall pay the costs due this Commission.
 S/ _________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _________________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ _________________________ DIANNE C. SELLERS COMMISSIONER